# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
### February 4, 2004 Session

## GEORGE D. WOODARD, Jr. v. THE ESTATE OF MARTHA ALMEDA SWOPE WOODARD, DECEASED, ET AL.

### Appeal from the Chancery Court for Hamilton County
#### No. 01-0399     Howell N. Peoples, Chancellor

### Filed March 1, 2004

---

### No. E2003-00258-COA-R3-CV

---

In 1964, Mr. and Mrs. Woodard executed a Joint Last Will and Testament (the "Joint Will") which provided that the survivor would receive the decedent's entire estate in fee simple. The Joint Will further provided that, upon the death of the survivor, the survivor's estate would be divided in equal one-fourth shares among George D. Woodard ("Plaintiff"), Mr. Woodard's son from a previous marriage, and Mr. and Mrs. Woodard's three daughters. Mrs. Woodard executed a new will in 1998 (the "1998 Will"), approximately twenty years after Mr. Woodard's death. Pursuant to the terms of the 1998 Will, Plaintiff was to receive $10,000, with the remainder of Mrs. Woodard's estate to be divided equally among her three daughters. Mrs. Woodard's three daughters sought to probate the 1998 Will after she passed away. Plaintiff then filed this lawsuit claiming, among other things, that the Joint Will created a contractual obligation on the part of Mrs. Woodard to distribute her estate in accordance with the terms of the Joint Will and, therefore, Plaintiff was entitled to one-fourth of Mrs. Woodard's estate. Plaintiff sued Mrs. Woodard's estate as well as his three half-sisters, Sandra Norton, Martha Scissom, and Barbara Lambert (collectively referred to as "Defendants"). The Trial Court granted Defendants' motion for summary judgment. We conclude there is a genuine issue of material fact regarding whether there existed a contractual obligation on the part of Mrs. Woodard to distribute her estate according to the terms of the Joint Will. Accordingly, we vacate the judgment of the Trial Court and remand for further proceedings.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Vacated; Case Remanded

D. MICHAEL SWINEY, J., delivered the opinion of the court, in which HERSCHEL P. FRANKS, J., and CHARLES D. SUSANO, JR., J., joined.

Timothy R. Simonds, Rossville, Georgia, for the Appellant George D. Woodard.

F.R. Evans, Chattanooga, Tennessee, for the Appellees Sandra Norton and Martha Scissom, each individually and as co-executrix of the Estate of Martha Almeda Swope Woodard.

# OPINION

## Background

George Dewey Woodard ("Mr. Woodard") and Sarah Virginia Haun were married in 1927 and had one son, Plaintiff, who was born in 1931. Plaintiff's mother passed away on April 30, 1935. In December of 1939, Mr. Woodard married Martha Almeda Swope ("Mrs. Woodard"). While Mr. and Mrs. Woodard were married, Mrs. Woodard inherited some property from her father which included a small grocery store. Mr. Woodard eventually built an apartment over the grocery store. When the apartment was completed, Mr. and Mrs. Woodard moved into the apartment along with Plaintiff. Over the next several years, Mr. and Mrs. Woodard's three daughters were born.

In January of 1964, Mr. and Mrs. Woodard executed a Joint Last Will and Testament. As relevant to this appeal, the Joint Will provides:

### ITEM I

Each of the undersigned hereby directs that his or her executor hereinafter named pay all just debts of the decedent, funeral expenses, the costs of administration of decedent's estate and all estate and inheritance taxes, if any, as soon after his or her death as is reasonably practicable, all such taxes imposed upon the estate of the decedent by any taxing authority by reason of death to be paid from and out of the residuary estate of such decedent and not charged to or collected from any devisee, legatee or beneficiary, regardless of whether or not such beneficiary is named in this will or is designated as such in any insurance policy or takes by reason of law.

### ITEM II

All the rest, residue and remainder of decedent's property and estate of every kind, nature and description, wheresoever situated and whether now owned or hereafter acquired, each of the undesigned hereby gives, devises and bequeaths to the survivor of the undersigned, in fee simple.

### ITEM III

Upon the death of the survivor of the undersigned or in the event that our deaths shall occur in or as a result of a common accident or disaster, then the estate of the survivor or the combined

estates of both of us, as the case may be, shall be apportioned, divided and distributed, share and share alike, to GEORGE DEWEY WOODARD, JR. (son of testator, George Dewey Woodard, Sr.) and our children, SANDRA SUE WOODARD, MARTHA ANN WOODARD, and BARBARA JEAN WOODARD, the descendants of any beneficiary named above who is then deceased to take, per stirpes, the parent's share.[1]

Mr. Woodard passed away on September 26, 1978. The Joint Will was admitted to probate, Mrs. Woodard was appointed the executrix of Mr. Woodard's estate, and Mr. Woodard's estate was probated.

Unbeknownst to Plaintiff, Mrs. Woodard executed a new will on October 1, 1998. As relevant to this appeal, the 1998 Will provided that Plaintiff would receive $10,000 with the remainder of Mrs. Woodard's estate to be divided equally among her three daughters. Mrs. Woodard passed away on January 12, 2001. Less than a month later, Plaintiff filed a Petition to Probate the 1964 Joint Will. Soon thereafter, Sandra Norton and Martha Scissom filed a Petition to Probate the 1998 Will. Plaintiff then withdrew his Petition and filed this lawsuit against the Estate of Martha Almeda Swope Woodard and his three half-sisters, Sandra Norton, Martha Scissom, and Barbara Lambert.

In his complaint, Plaintiff alleged that the Joint Will was irrevocable and constituted a binding and enforceable contract between Mr. and Mrs. Woodard with regard to how their estates would be distributed. According to Plaintiff, the language of the Joint Will established a contract that "neither spouse would revoke their January 14, 1964 Joint Will and … the estate of the surviving spouse would be distributed equally between" Mr. Woodard's four children. Plaintiff claimed the value of Mrs. Woodard's estate was approximately $320,000, which included a certificate of deposit ("CD") in excess of $50,000 to $60,000 in Mrs. Woodard's and Sandra Norton's names. Plaintiff also brought various tort claims against the individual Defendants claiming, among other things, that they had converted and misappropriated assets from the estate and tortiously interfered with Mrs. Woodard's contractual obligation under the Joint Will. Defendants answered the complaint denying the pertinent allegations contained therein and further denying Plaintiff was entitled to anything other than the $10,000 provided for in the 1998 Will.

Plaintiff filed a motion for partial summary judgment with respect to his claim that the Joint Will created a contractual obligation between Mr. and Mrs. Woodard and, therefore, Plaintiff was entitled to a full one-fourth of Mrs. Woodard's estate. Defendants opposed Plaintiff's motion and filed their own motion for summary judgment claiming the entire lawsuit should be dismissed.

---

[1] The married names of the three daughters are Sandra Norton, Martha Scissom, and Barbara Lambert.

In support of his motion for partial summary judgment, Plaintiff attached his deposition. In his deposition, Plaintiff testified that he was living in Atlanta attending college and working at Fulton Cotton Mills when Mr. and Mrs. Woodard executed the Joint Will. Mr. Woodard mailed Plaintiff an unsigned copy of the Joint Will. Plaintiff never discussed the Joint Will with his father, nor did he talk with the attorney who drafted it. The first conversation Plaintiff had specifically regarding the Joint Will occurred in 1994 when he made a telephone call to Mrs. Woodard asking that she send him a signed copy of the Joint Will, which he received three days later in the mail. Prior to that, Plaintiff did not discuss the Joint Will with Mrs. Woodard, but she did tell him on several occasions that he was "included in the will and would be a part of the estate at her death." Plaintiff's father likewise had told him he would share in the estate. Mrs. Woodard never told Plaintiff she had executed a new will, and he did not learn of the existence of the 1998 Will until after her death. After Mrs. Woodard passed away, Plaintiff's wife allegedly had a discussion with Defendant Barbara Lambert. According to Plaintiff, his wife inquired why Mrs. Woodard waited twenty years after becoming a widow before making a new will. Ms. Lambert responded by stating that her mother:

> had always told all of the daughters that she couldn't produce a new will, that she was bound by the 1964 will, a joint will. And she said all those years that she couldn't do one.... But one of my sisters, Ms. Scissom, kept going to lawyers to find one that said she could produce a new will, and she finally found one and she produced a new will in 1998....[2]

Sandra Norton's deposition was submitted in support of Defendants' motion for summary judgment. When questioned about her Mother's CD, Ms. Norton testified that her mother went to the bank and it was explained to her "that she could do it that way (i.e., put it in both their names) for me to be able to get the money upon her death and it would be mine and she told me what she wanted me to do with it then." According to Ms. Norton, her mother told her to use the money to pay any outstanding bills that were owed and then to divide any remaining money among the three daughters. Ms. Norton explained that her mother was very independent and neither she nor her sisters needed to assist their mother with her financial affairs and her mother continued to manage her rental properties up until two or three weeks before she passed away. Ms. Norton testified she never saw the Joint Will prior to her mother's death, although she knew a will had been probated when her father died. Prior to her father's passing away, Ms. Norton was told by both of her parents that they had prepared a will and were leaving each of the children one-fourth of the estate. A few years ago, Ms. Norton overheard her mother stating she wanted to go to a lawyer to have her will changed. Ms. Norton's sister, Martha, took their mother to a lawyer's office and the 1998 Will was executed. After the 1998 Will was prepared, Ms. Norton's mother told her that she wanted her three

---

[2] Plaintiff filed his wife's affidavit which detailed her supposed conversation with Barbara Lambert. Defendants claimed any testimony about this alleged conversation was hearsay and inadmissible. Plaintiff argued there were hearsay exceptions which allowed its admission. The Trial Court never resolved this evidentiary issue. We express no opinion on whether or not this testimony is admissible as such a determination is not necessary to our decision.

daughters to divide everything and she wanted Plaintiff to have $10,000. Ms. Norton never heard her mother comment on whether the contents of the Joint Will could affect her creating a new will. Ms. Norton claimed she never suggested to her mother that the will be changed and she never heard any of her sisters make such a suggestion. Ms. Norton never heard her mother say the Joint Will prohibited her from making a new will. Ms. Norton did recall that many years ago, her mother stated she did not want to sign the Joint Will. Her mother claimed she sat outside in the hallway at the lawyer's office refusing to sign the Joint Will, but eventually she did sign it after several hours of Mr. Woodard's insisting that she do so.

The affidavit of attorney Frank Thompson ("Thompson") was filed with the Trial Court. Thompson drafted the Joint Will. In his affidavit, Thompson stated that he had "no recollection whatever of Mr. and Mrs. Woodard and performed no services for them either before or after" the date the Joint Will was signed. Notwithstanding the fact that Thompson had "no recollection whatever" of Mr. and Mrs. Woodard, he went on to state that he was "quite sure that the irrevocability of the will was not considered by or discussed with the testators. If I had been aware of any intention in this regard, I would have expressly included it in the language of the will."

The Trial Court denied Plaintiff's motion for partial summary judgment and granted Defendants' motion for summary judgment. In so doing the Trial Court concluded that, even assuming there was a contract between Mr. and Mrs. Woodard to distribute their property in the manner set forth in the Joint Will, "the issue becomes the method of distribution mandated by the Joint Will." According to the Trial Court, Item II in the Joint Will gave to the survivor the remainder of the decedent's estate in fee simple. Then Trial Court then stated:

> Item III of the Joint Will tells how the remainder of the estate should be apportioned upon the death of the survivor of the undersigned or upon the simultaneous deaths of both of the undersigned. This language infers that the survivor of the undersigned received a life estate interest in the estate. A "life estate" is defined as "[a]n estate whose duration is limited to the life of the party holding it, or some other person" Black's Law Dictionary 924 (6th ed. 1990).

> There is nothing in the remainder of the Joint Will that clarifies this ambiguity regarding the type of interest the survivor of the undersigned was to receive in the estate. Due to this irreconcilable ambiguity, the intent of Mr. and Mrs. Woodard … cannot be ascertained. Therefore, the court must rely on … rules of construction. Under these rules, the absolute estate granted in Item II cannot be limited by the inferred life estate granted in Item III. Based on the language in Item II, Mrs. Woodard received the estate in fee simple upon the death of Mr. Woodard, Sr. and could thus apportion that estate as she so desired.

The Trial Court then granted Defendants' motion for summary judgment and dismissed the complaint.

Plaintiff appeals raising several issues. Essentially, Plaintiff claims the Trial Court erred when it denied his motion for partial summary judgment, and further erred when it granted Defendants' motion for summary judgment. In the alternative, Plaintiff claims that, at a minimum, there are genuine issues of material fact regarding whether the Joint Will was intended to create a contractual obligation between Mr. and Mr. Woodard and, therefore, summary judgment was improper. Defendants argue on appeal that the Trial Court properly granted their motion for summary judgment and there are no genuine issues of material fact concerning the existence of any contractual obligation arising from the Joint Will.

**Discussion**

The standard for review of a motion for summary judgment is set forth in *Staples v. CBL & Associates, Inc.*, 15 S.W.3d 83 (Tenn. 2000):

> The standards governing an appellate court's review of a motion for summary judgment are well settled. Since our inquiry involves purely a question of law, no presumption of correctness attaches to the lower court's judgment, and our task is confined to reviewing the record to determine whether the requirements of Tenn. R. Civ. P. 56 have been met. *See Hunter v. Brown*, 955 S.W.2d 49, 50-51 (Tenn. 1997); *Cowden v. Sovran Bank/Central South*, 816 S.W.2d 741, 744 (Tenn. 1991). Tennessee Rule of Civil Procedure 56.04 provides that summary judgment is appropriate where: (1) there is no genuine issue with regard to the material facts relevant to the claim or defense contained in the motion, *see Byrd v. Hall*, 847 S.W.2d 208, 210 (Tenn. 1993); and (2) the moving party is entitled to a judgment as a matter of law on the undisputed facts. *See Anderson v. Standard Register Co.*, 857 S.W.2d 555, 559 (Tenn. 1993). The moving party has the burden of proving that its motion satisfies these requirements. *See Downen v. Allstate Ins. Co.*, 811 S.W.2d 523, 524 (Tenn. 1991). When the party seeking summary judgment makes a properly supported motion, the burden shifts to the nonmoving party to set forth specific facts establishing the existence of disputed, material facts which must be resolved by the trier of fact. *See Byrd v. Hall*, 847 S.W.2d at 215.

> To properly support its motion, the moving party must either affirmatively negate an essential element of the non-moving party's claim or conclusively establish an affirmative defense. *See McCarley v. West Quality Food Serv.*, 960 S.W.2d 585, 588 (Tenn. 1998);

> *Robinson v. Omer*, 952 S.W.2d 423, 426 (Tenn. 1997). If the moving
> party fails to negate a claimed basis for the suit, the non-moving
> party's burden to produce evidence establishing the existence of a
> genuine issue for trial is not triggered and the motion for summary
> judgment must fail. *See McCarley v. West Quality Food Serv.*, 960
> S.W.2d at 588; *Robinson v. Omer*, 952 S.W.2d at 426. If the moving
> party successfully negates a claimed basis for the action, the non-
> moving party may not simply rest upon the pleadings, but must offer
> proof to establish the existence of the essential elements of the claim.
>
> The standards governing the assessment of evidence in the
> summary judgment context are also well established. Courts must
> view the evidence in the light most favorable to the nonmoving party
> and must also draw all reasonable inferences in the nonmoving
> party's favor. *See Robinson v. Omer*, 952 S.W.2d at 426; *Byrd v.
> Hall*, 847 S.W.2d at 210-11. Courts should grant a summary
> judgment only when both the facts and the inferences to be drawn
> from the facts permit a reasonable person to reach only one
> conclusion. *See McCall v. Wilder*, 913 S.W.2d 150, 153 (Tenn.
> 1995); *Carvell v. Bottoms*, 900 S.W.2d 23, 26 (Tenn. 1995).

*Staples*, 15 S.W.3d at 88-89. A fact is "material" for summary judgment purposes, if it "must be decided in order to resolve the substantive claim or defense at which the motion is directed." *Luther v. Compton*, 5 S.W.3d 635, 639 (Tenn. 1999)(quoting *Byrd v. Hall*, 847 S.W.2d at 211).

The cardinal rule in construing a will is to ascertain the intent of the testator. *Goodwin v. Nave*, 912 S.W.2d 719, 721 (Tenn. Ct. App. 1995). The intent of the testator must be given effect unless it contravenes some rule of law or public policy. *Presley v. Hanks*, 782 S.W.2d 482, 487 (Tenn. Ct. App. 1989). "However, a rule of equal force is that where a will is not ambiguous it is unnecessary to resort to rules of construction." *Goodwin*, 912 S.W.2d at 721 (citing *Moore v. Moore*, 204 Tenn. 108, 315 S.W.2d 526 (1958); *Davis v. Price*, 189 Tenn. 555, 226 S.W.2d 290 (1949)). Moreover, a will should be construed to give effect to every word and clause contained therein. *Presley*, 782 S.W.2d at 489 (citing *Bell v. Shannon*, 212 Tenn. 28, 367 S.W.2d 761 (1963)).

In the present case, the Trial Court concluded that, upon the death of Mr. Woodard, his entire estate passed to Mrs. Woodard in fee simple. We agree with this conclusion of the Trial Court and believe that is the clear and unambiguous intent of Item II. However, the Trial Court then determined that the language in Item III limited the fee simple interest created in Item II by "inferring" Mrs. Woodard was to receive only a life estate interest in the estate. Since the fee simple estate was cut down to a life estate in less than a clear manner, the Trial Court determined that Item III was of no effect, relying on *Teague v. Snyder*, 121 Tenn. 132, 114 S.W. 484 (1908). In *Teague*, our Supreme Court stated:

The rule is well settled that the courts refuse to cut down an estate already granted in fee or absolutely, when the supposed terms of limitation are to be found in some subsequent portion of the will, and are not in themselves clear, unmistakable, and certain, so that there can be no doubt of the meaning and intention of the testator.…

If the expression in the will is doubtful, the doubt is resolved against the limitation and in favor of the absolute estate.…

*Teague*, 121 Tenn. at 156, 114 S.W. at 490 (citations omitted).

We respectfully disagree with the Trial Court's interpretation of Item III and its consequent effect. We believe the intent of Items II and III is unambiguous and these two Items can be read in conjunction with each other so that both clauses are given full effect. Specifically, in accordance with Item II, Mr. Woodard's entire estate passed to Mrs. Woodard in fee simple when Mr. Woodard died. Mrs. Woodard was then free during her life to use or dispose of her estate in whole or in part in any manner which she saw fit. Item III simply directs what will happen to whatever, if anything, is left of Mrs. Woodard's estate upon her death, i.e., the estate is to be divided equally among the four named beneficiaries. Item III does not infer or otherwise create a life estate and it does not operate to limit the fee simple estate Mrs. Woodard received in accordance with Item II. With regard to the terms of the Joint Will, we conclude Mrs. Woodard inherited a fee simple estate and was, therefore, free to use or dispose of that estate during her lifetime as she saw fit. However, in accordance with Item III, whatever was remaining in Mrs. Woodard's estate upon her death was to be divided equally among Plaintiff and his three half-sisters. Accordingly, the Trial Court erred when it determined that Item III "inferred" a life estate and rendered that portion of the Joint Will without effect.

Even though we have concluded the terms of the Joint Will are clear and unambiguous, this does not necessarily mean Mrs. Woodard had any contractual obligation created by the Joint Will. A will by its very nature remains revocable until the testator's death. *Rogers v. Russell*, 733 S.W.2d 79, 86 (Tenn. Ct. App. 1986). If there was a contract between Mr. and Mrs. Woodard to dispose of their estates in the manner provided for in the Joint Will, then it is this contract and not the will which became irrevocable upon the death of Mr. Woodard. *Id*. As noted above, there are competing motions for summary judgment regarding whether there was such a contractual obligation.

In 1978, the Tennessee legislature passed what is referred to as the Trautman Act. This Act provides, *inter alia*, that the execution of a joint will or mutual wills "does not create a presumption of a contract to make a will, or to refrain from revoking a will." Tenn. Code Ann. § 32-3-107(b). The Act also sets forth the manner in which a contract to make a will or not to revoke a will can be established. *See* Tenn. Code Ann. § 32-3-107(a)(1) - (3). However, as this Act does not apply retroactively, we are required here to apply the law as it existed prior to its enactment. *See*

*Junot v. Estate of Gilliam*, 759 S.W.2d 654 (Tenn. 1988); *In re Estate of Hurdle*, 868 S.W.2d 627 (Tenn. Ct. App. 1993).

The only way Plaintiff can claim an entitlement to one-fourth of Mrs. Woodard's estate is to prove a contract existed between Mr. and Mrs. Woodard which legally obligated Mrs. Woodard to distribute her estate in the manner provided in the Joint Will. *See*, *e.g., Junot v. Estate of Gilliam*, 759 S.W.2d 654, 657 (Tenn. 1988)("Under the terms of Mr. Gilliam's 1974 will, the entire estate vested in Mrs. Gilliam upon his death, unconditionally and without any kind of restraint or restriction. Unless a contract between the parties could be proved, so as to make her will of the same date irrevocable, she was free to dispose of the estate as she saw fit."). In *Junot*, our Supreme Court observed that:

> It is well settled that in order to establish a contract to make or not to revoke a will, where the contract is not otherwise documented, evidence of such a contract must be clear and convincing. The mere fact that parties have executed mutual and reciprocal wills on the same date is not, in and of itself, sufficient to establish the existence of such a contract. *See First Christian Church of Guthrie, Kentucky v. Moneypenny,* 59 Tenn. App. 229, 439 S.W.2d 620 (1968). That fact, together with other evidence concerning the circumstances of the parties, may be sufficient to establish such a contract. *Church of Christ Home for Aged, Inc. v. Nashville Trust Co.*, 184 Tenn. 629, 202 S.W.2d 178 (1947). The issue, however, in every case is one of fact, not law, to be determined in light of all of the surrounding circumstances.

*Junot*, 759 S.W.2d at 657.

Although proving by clear and convincing evidence that Mr. and Mrs. Woodard created a contract to distribute their estates in the manner set forth in the Joint Will may be no easy task, the fact that the Woodards executed a joint will as opposed to mutual wills could certainly impact the outcome of this issue. For example, in *Seat v. Seat*, 172 Tenn. 618, 113 S.W.2d 751 (1938), the following discussion is found:

> There is some confusion in the cases, probably because the distinction is not kept clear between the degree of proof applicable in cases involving separate but mutual wills and in cases involving joint wills, and joint dispositions of common property. Where mutual wills are involved it is generally held that the contract to make a joint testamentary disposition cannot be inferred because the wills might have been made without either party knowing that the other was executing it. That infirmity does not arise in cases involving a joint will, simultaneously executed. The fact of a concurring purpose and

intent is shown by the writing itself and by the signature of the parties, and proof aliunde the will is not necessary to show concurrence of purpose or mutual intent. In such cases the courts generally, though not uniformly, hold that the understanding to make a joint reciprocal will may be conclusively inferred from the fact of its execution, together with the provisions of the will and the circumstances existing when the parties joined in executing it. The foregoing rule is supported directly or in principle in many cases. Among them Gray v. Perpetual Trustee Co. (Eng.), 60 A. L. R. 617; Beveridge v. Bailey, 53 S. D. 98, 382, 220 N.W. 462, 868, 60 A.L.R. 619; Canada v. Ihmsen, 33 Wyo. 439, 240 P. 927, 43 A.L.R. 1011, Note VI; Doyle v. Fischer, 183 Wis. 599, 198 N.W. 763, 33 A.L.R. 733; Stevens v. Myers, 91 Ore. 114, 177 P. 37, 2 A.L.R. 1155; Frazier v. Patterson, 243 Ill. 80, 90 N.E. 216, 27 L.R.A., N. S., 508, 17 Ann. Cas. 1003; Clements v. Jones, 166 Ga. 738, 144 S.E. 319. The terms of the joint will, the fact that the greater part of the real estate was held by the entirety and might have passed to the survivor, that the property was acquired by the parties and owned jointly or in common, that defendant left the will in force from the date of execution until her husband's death, and the equitable manner in which the parties disposed of their joint and common property, authorizes the inference that some sort of domestic prearrangement was made by Mr. and Mrs. Seat looking to an equitable division of their property and which culminated in their joint will. As said in Harris v. Morgan, 157 Tenn. 140, 153, 154, 7 S.W.2d 53, such facts negative any conclusion but that the will was executed pursuant to agreement.…

*Seat,* 172 Tenn. at 624-25, 113 S.W.2d at 753-54. *See also In re: Estate of Hurdle*, 868 S.W.2d 627, 630 (Tenn. Ct. App. 1993)("[U]nlike joint wills which patently evidence a contractual intent, the wills in this case are mutual and reciprocal … [and] [t]here is simply no proof … [that] the parties intended their wills to be mutual contracts.")(discussing pre-Trautman Act law).

In *Winningham v. Winningham*, 966 S.W.2d 48 (Tenn. 1998), our Supreme Court noted that prior to the enactment of the Trautman Act in 1978, "the execution of reciprocal wills by a husband and wife raised the presumption that the wills had been executed pursuant to an agreement." *Id.* at 50 (relying on *In re Estate of Bright,* 482 S.W.2d 555, 556 (Tenn.), *cert. denied sub nom. Womack v. Fair*, 409 U.S. 915 (1972)("Where . . . the wills are identical in language, witnessed by the same persons, at the same time and place, and the contracting parties are husband and wife, it is well nigh conclusive that such wills were executed in accordance with their mutual contract to dispose of their property in this manner."). *But see Matter of Estate of Fusse*, 803 S.W.2d 245 (Tenn. Ct. App. 1990)(affirming the trial court's conclusion that no contractual intent had been proven even though the husband and wife executed essentially identical mutual wills at the same time). Although the presumption of a contractual agreement may arise, execution of a joint will, by

-10-

itself, is not conclusive proof of the existence of a contract. As observed in *Rogers v. Russell*, 733 S.W.2d 79 (Tenn. Ct. App. 1986):

> [The courts in this state] have made clear that the existence of a testamentary contract is proved by reference to the nature of the contract, its terms, the circumstances antecedent to the will, and the circumstances existing when the parties joined in the will's execution.… [O]ur courts have always required more than the proof of the execution of a joint will to sustain a claim that a contract existed between the two parties to dispose of their estates in accordance with the terms of the will. *Harris v. Morgan*, 12 Tenn. App. 445, 448 (1930).

*Rogers*, 733 S.W.2d at 85, 86.

Reconciling the somewhat inconsistent case holdings discussed above, we hold that prior to the enactment of the Trautman Act in 1978, the execution of a joint will raised a presumption that the will had been executed pursuant to an agreement between the parties as to how their respective estates would be disposed of at their deaths. While this presumption is not conclusive, it is sufficient to defeat Defendants' motion for summary judgment. Given the record before us, this presumption by itself is not clear and convincing evidence sufficient to grant Plaintiff's motion for summary judgment as other relevant facts such as the circumstances existing when Mr. And Mrs. Woodard executed the Joint Will must be considered as well.

Therefore, we conclude that there are genuine issues of material fact regarding whether there was a contract between Mr. and Mrs. Woodard to dispose of their estates in the manner set forth in the Joint Will and, therefore, none of the parties were entitled to summary judgment on this issue.[3] The Trial Court's judgment granting Defendants' motion for summary judgment is vacated. Any remaining issues are pretermitted.

## Conclusion

The judgment of the Trial Court is vacated, and this cause is remanded to the Trial Court for further proceedings as are necessary consistent with this Opinion. The costs on appeal are assessed against the Appellees Sandra Norton and Martha Scissom, each individually and as co-executrix of the Estate of Martha Almeda Swope Woodard.

---

[3] For the sake of brevity, we did not discuss all of the evidence presented by the parties in support of their respective motions for summary judgment.

_____
D. MICHAEL SWINEY, JUDGE